DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Proposed Attorneys for the Debtor*
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200
Jonathan S. Pasternak, Esq.
Erica R. Aisner, Esq.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
In re:

                                        Chapter 11

THE FRESH ICE CREAM COMPANY, LLC,          Case No. 17-40716

                   Debtor.
---------------------------------------------------------------X

## DECLARATION OF DAVID STEIN
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-4

DAVID STEIN, declares under penalties of perjury:

I am the Managing Member of The Fresh Ice Cream Company, LLC, the above-

referenced debtor and debtor-in-possession (the "Debtor") as well as, through my entity, Cherry

Tree Partners, LLC,  a 54.76% Series A common stock holder in the Debtor. As such, I am fully

familiar with the Debtor's operations, businesses and financial affairs.

I submit this declaration pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 1007-4 of the Local Rules for the United States

Bankruptcy Court for the Eastern District of New York.

### BACKGROUND

1.      The Debtor is a distributor of fine frozen dairy and non-dairy products under the

trademarked brand name *Steve's Ice Cream*. The Debtor distributes its products to well-known

grocers and food stores, including Whole Foods Markets, throughout the Eastern and Western United States.

2.    In 1973, *Steve's Ice Cream* opened in Somerville, Massachusetts initially as a single store ice cream parlor which featured an innovative new concept in serving super premium ice cream – Steve's offered "mix-ins", i.e., condiments mixed by hand into the ice cream before the customer's eyes. Items such as candies, cookies, nuts and fruits could now be blended into a simple ice cream scoop to create a custom flavor.

3.    Multiple stores were opened, both Company owned and under franchise and licensing arrangements, throughout New England and eventually in cities across the country. I became a key employee at the Company in 1983.

4.    In or about 1985, Richard Smith acquired *Steve's Ice Cream* and expanded the business beyond the parlors/mix-in concept to producing pre-packaged ice cream containers for wholesale similar to competitors such as *Ben and Jerry's* and *Häagen-Dazs*.

5.    In the 1980's, at parlors and in re-packaged containers, Steve's generated annual retail sales peaking at approximately $100 million, and created brand awareness that still resonates today.

6.    In the 1990's Smith moved away from the *Steve's Ice Cream* brand to focus on his other brands, ultimately ending his business in 2007.

7.    In 2008, I acquired the *Steve's Ice Cream* trademark through my own personal investment, and founded the Company to re-introduce the Steve's Ice Cream brand. After research and development, and test marketing, the first pints of our new Steve's Ice Cream were sold in December 2010.

8.      In starting the Company, I drew on my professional experience of the Steve's brand and the ice cream industry, having joined the original *Steve's Ice Cream* during its pioneering days in Boston, after graduating from Harvard University in1983. I learned the craft of making Steve's Ice Cream at the original store, and went on to become Co-Chairman & CEO, as original Steve's went public on Nasdaq (1985), and grew to become the #3 US frozen novelty Company, after Nestlé and Unilever, by licensing and marketing ice cream and frozen novelty brands such as Weight Watchers, Yoplait, Tropicana and Godiva, and acquiring Eskimo Pie and Chipwich. My c vision was to leverage Steve's' authentic heritage to make Steve's the leading brand for flavor and innovation in today's ice cream market.

9.      I opened a manufacturing facility in Long Island and restarted manufacturing and distribution *Steve's Ice Cream,* selling to high end stores in New York City and Long Island. We then expanded the product line to include non- dairy flavors to take advantage of emerging health trends in the United States. We also opened a retail store location in New York City on 42nd Street.

10.      The return of Steve's' was met with great enthusiasm by customers already attuned to the burgeoning artisan foods movement. The super-premium ice cream category, long dominated by *Ben & Jerry's* and *Haagen-Däzs*, was ripe for transformation.  Steve's once again used its original concept of Mixing-In, but now as an artisan among artisans, featuring such inclusions as ricotta cheese from Salvatore Brooklyn, stone-ground organic chocolate from Taza Chocolate, and speculoos cookie butter from Holland. We used as our mottos "Craft is Community" and "A Flavor Revolution Starts in Small Batches" to communicate the Mix-In as an expression of artisan culture, and to position Steve's as its leader in ice cream.

11.     Steve's' flavors are revolutionary right down to the base mix – with dairy-free flavors that are just as indulgent and characterful as those made with milk and cream, not second-best "alternatives" to real ice cream. Millennials generally seek to enjoy broadly treat alternative foods (dairy-free, raw, vegan, etc.) as attractive choices within a richly inclusive menu, to complement a mindful, yet indulgent lifestyle.  In keeping with this, Steve's dairy free flavors appeal to consumers as flavors first and foremost, and frequently are purchased without concern – or even awareness – that they are, in fact, dairy free. By contrast, most dairy free competitors present their fares primarily as dairy-free products, targeting consumers who avoid dairy products. This has proven to be a strong point of difference and competitive advantage for Steve's by helping to attract new converts to the dairy-free segment and to extend to our dairy-free flavors the halo earned by Steve's for its revolutionary dairy ice cream flavors.

12.     The Debtor was funded by a series of equity and debt raises between 2008 and 2016.  $5.7 million of Common Equity (including my $4.2 million initial investment) was raised through February 2012.  $3.1 million of Preferred Equity (including an additional $607,605 investment by me) was raised through April 2014.  Also in April 2014, $500,000 of secured debt was borrowed from Empire State Certified Development Corporation.  From September 2014 through May 2016, an additional $5 million was raised in unsecured, convertible and non-convertible debt financing.  Also in 2016, the Company borrowed $175,000 from SOS Capital, Inc.

13.     By 2014, after doubling in sales each year, we had increased our annual revenues to approximately $4 million and expanded our distribution to the West Coast.  Entering 2015, we once again expected demand for Steve's to roughly double, as it had in prior years.

4

14.     To meet such increasing demand, it was determined that outsourcing production through a co-packing arrangement would be necessary. The Debtor initially made co-packing arrangements with Hudsonville Ice Cream in Holland, Michigan.  However, in implementing the transition from self-manufacture to outsourced production of its highly specialized, artisanal product, the Company encountered problems, including delays and defects in new packaging, that caused material losses of revenues, profits and customers. These problems resulted from, and were compounded by, actions and omissions by an individual who had helped me co-found the new Steve's, but who is no longer associated with the Company.

15.     In 2015, despite these problems, gross revenues increased to almost $6 million. However, $1.6 million was sold at a loss to liquidate product that was unsalable due to defective packaging, and the Company was unable to ship additional orders for more than $2 million due to out-of-stocks. As a result, the Company suffered material losses of revenues, profits and customers.

16.     To increase management's capacity to address these financial and operational problems, I recruited an experienced ice cream executive and appointed him as CEO in September, 2015. Beginning in October 2015, additional capital of $1.7 million was infused in the form of senior unsecured convertible notes, but this capital was unfortunately too late and too little in retrospect, as the Company remained chronically unable to finance production in sufficient quantities to keep all flavors in stock and fill orders on a timely basis and at acceptable fill rates.

17.     In April 2016, I was able to raise an additional $700,000 in new capital, also in the form of senior unsecured convertible notes. At this time, I took back the CEO position and

switched the co-packing to Schoep's Ice Cream in Madison, Wisconsin, which resulted in better margins, and improved the Company's ability to supply its customers.

18.    After this initial improvement in operations, the Company once again became capital-constrained when its Factor stopped purchasing new invoices and began applying all collections of accounts receivable to repay advances, denying the Company needed working capital. The Company borrowed $175,000 from SOS Capital in mid-2016 in an attempt to address the capital shortage.

19.    The Company nonetheless remained undercapitalized and unable to fully supply customers, and pursued new restructuring/investment opportunities with several different parties, none of which came to fruition.  As time proceeded, the Debtor accrued debt to its former landlord as well as employees and the trade.

20.    In 2016, sales fell to $3 million primarily due to the lack of sufficient quantities of product to distribute, with more than $500,000 of unfilled orders.

21.    Despite the current lack of working capital, today the Debtor still has over $300,000 of stored inventory (albeit not of all flavors customers want to buy) at a warehouse in Indiana and still has product on shelf in approximately 3,000 stores in New York, California, Texas and Illinois, among other places.

22.    The Debtor plans on making new co-packing arrangements with an enterprise in Hartford, Connecticut, and return the business model back to artisanal, smaller scale production, which will give the Debtor more flexible ordering and sales ability (initially allowing a given amount of capital to be used to produce a greater number of flavors) and thus giving the Company an opportunity to restore some of its current unavailable flavors to the shelves.

23.     The Debtor believes that its intangible assets have significant value, which value can be maximized by restoring operations to historic levels. Although admittedly, additional capital or financing would be needed, the Debtor believes that for modest additional financing or capital it could reach prior volume and revenues, making Steve's a viable and strong brand on the market and an attractive takeover target or merger candidate.

23.     If the Debtor is afforded a reasonable but not lengthy time in Chapter 11, it believes it can obtain the necessary capital or achieve a strategic transaction that will maximize the value of its assets, and hopefully a return to all of its creditors, secured and unsecured alike.

### INFORMATION REQUIRED BY LOCAL BANKRUTPCY RULE 1007-2

In addition to the foregoing, Local Bankruptcy Rule 1007-4 requires certain information related to the Debtors, which is set forth below.

**Local Rule 1007-4(a)(i)**

The Debtor is not a small business debtor within the meaning of 11 U.S.C. §101(51D).

**Local Rule 1007-4(a)(ii)**

The Debtor owns and operates Steve's Ice Cream currently located at 278 6th Street, Brooklyn, New York 11215.

**Local Rule 1007-4(a)(iii) and (iv)**

This case was not originally commenced under Chapter 7 or 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Upon information and belief, no committee or professionals were employed prior to the filing of the Order for relief.

**Local Rule 1007-4(a)(v)**

A list of the holders of the 20 largest general unsecured claims is annexed hereto as **Exhibit A.**

**Local Rule 1007-4(a)(vi)**

A list of the Debtor's 5 largest secured creditors is annexed hereto as **Exhibit B**.

**Local Rule 1007-4(a)(vii)**

A balance sheet of the Debtor as of November 9, 2016 is annexed hereto as **Exhibit C**.

**Local Rule 1007-4(a)(viii)**

There are no publicly held securities of the Debtor.

**Local Rule 1007-4(a)(ix)**

The Debtor neither owns nor leases any real property. None of the Debtor's property is in possession of a receiver or custodian.

**Local Rule 1007-4(a)(x) and (xi)**

The Debtor's location of its books and records and principal place of business is 278 6th Street, Brooklyn, New York 11215.

**Local Rule 1007-4(a)(xii)**

A list of lawsuits is annexed hereto as Exhibit D.

**Local Rule 1007-4(a)(xiii)**

The Debtor's senior management consists of David Stein, Managing Member.

**Local Rule 1007-4(a)(xiv) and (xv)**

The Debtor's estimated payroll to non-office employees for the thirty (30) day period following the Chapter 11 petition is $35,000. The Debtor's estimated payroll to officers for the thirty (30) day period following the Chapter 11 petition is $7,700.

**Local Rule 1007-4(xvi)**

A 13 week cash flow projection is annexed hereto as **Exhibit E**.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated:  Brooklyn, New York
         February 17, 2017

                                    _/s/ David Stein_
                                         DAVID STEIN